ORIGINAL

1  WAN J. KIM
   Assistant Attorney General
2  SHANETTA Y. CUTLAR (CA Bar No. 169849)
   Chief, Special Litigation Section
3  BENJAMIN O. TAYLOE, JR. (DC Bar No. 422910)
   LEE R. SELTMAN (CA Bar No. 168857)
4  MARY R. BOHAN (DC Bar No. 420628)
   WILLIAM G. MADDOX (DC Bar No. 000020540)
5  JACQUELINE CUNCANNAN (DC Bar No. 462985)
   MATTHEW J. DONNELLY (IL Bar No. 6281308)
6  Trial Attorneys
   United States Department of Justice
7  Civil Rights Division
        Special Litigation Section
8       950 Pennsylvania Avenue, N.W.
        Washington D.C.  20035
9       (202) 514-6255

10 DEBRA W. YANG
   United States Attorney
11 LEON W. WEIDMAN
   Assistant United States Attorney
12 Chief, Civil Division
   GARY L. PLESSMAN
13 Assistant United States Attorney
   Chief, Civil Fraud Section
14 HOWARD DANIELS (CA Bar No. 081764)
   Assistant United States Attorney
15     300 North Los Angeles Street
       Federal Building, Room 7516
16     Los Angeles, CA  90012
       (213) 894-4024
17
18 Attorneys for the United States of America

19            UNITED STATES DISTRICT COURT

20     FOR THE CENTRAL DISTRICT OF CALIFORNIA

21                 WESTERN DIVISION

22 UNITED STATES OF AMERICA,        )   CASE NO. CV 06-2667 GPS
        Plaintiff,                  )
                                    )
23      vs.                         )   AMENDED
                                    )   CONSENT JUDGMENT
24 STATE OF CALIFORNIA; THE         )
   HONORABLE ARNOLD SCHWARZENEGGER, )
25 Governor of the State of         )
   California, in his official      )
26 capacity only; STEPHEN W. MAYBERG, )
   Director of the California       )
27 Department of Mental Health, in  )
   his official capacity only;      )
28 SHARON SMITH NEVINS, Executive   )
   Director of Metropolitan         )
   State Hospital, in her           )

DOCKETED ON CM

FEB 2 8 2007

BY _____ 010

FILED
CLERK, U.S. DISTRICT COURT

FEB 27 2007

CENTRAL DISTRICT OF CALIFORNIA
BY                        DEPUTY

1  official capacity only;                    )
   OCTAVIO C. LUNA, Executive                  )
2  Director of Patton State Hospital,          )
   in his official capacity only;             )
3  MELVIN E. HUNTER, Executive                 )
   Director of Atascadero State                )
4  Hospital, in his official capacity          )
   only; and DAVE GRAZIANI,                    )
5  Executive Director of Napa State            )
   Hospital,in his official                    )
6  capacity only,                              )
          Defendants.                          )
7  _____  )

8       Simultaneously herewith, Plaintiff, the United States of

9  America filed a Complaint under the provisions of 42 U.S.C.

10 § 1997 against the Defendants, seeking to remedy an alleged

11 pattern or practice of conduct that was alleged to deprive

12 patients of Metropolitan State Hospital, in Norwalk, California,

13 Patton State Hospital in Patton, California, Atascadero State

14 Hospital in Atascadero, California, and Napa State Hospital, in

15 Napa, California (collectively, and including any facility that

16 supplements or replaces them, the "State Hospitals") of rights,

17 privileges, and immunities secured or protected by the

18 Constitution or laws of the United States.  On the same date, the

19 Parties in this matter filed a Stipulation for Consent Judgment

20 and Agreement ("Stipulation").

21      Noting the general principle that settlements are to be

22 encouraged, particularly settlements between governmental

23 entities, and having considered the Stipulation and the terms of

24 the measures, set forth herein, that the Defendants agree to

25 undertake to improve conditions at the State Hospitals, it is

26 ORDERED, ADJUDGED AND DECREED that pursuant to the Stipulation,

27 and good and reasonable cause appearing therefore, Judgment shall

28

1   be entered in this matter pursuant to the following terms and

2   conditions:

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PART I**

**ENHANCEMENT PLAN**

----------------------------------------------------------------

**Table of Contents**

A.   Definitions . . . . . . . . . . . . . . . . . . . - 6 -

      1.   Effective Date . . . . . . . . . . . . . . - 6 -

      2.   Consistent With Generally Accepted Professional

         Standards of Care . . . . . . . . . . . . - 6 -

B.   Introduction . . . . . . . . . . . . . . . . . - 6 -

C.   Integrated Therapeutic and Rehabilitation Services

   Planning   . . . . . . . . . . . . . . . . . . - 7 -

      1.   Interdisciplinary Teams . . . . . . . . . - 7 -

      2.   Integrated Therapeutic and Rehabilitation Service

         Planning . . . . . . . . . . . . . . . . - 9 -

D.   Integrated Assessments . . . . . . . . . . . . - 20 -

      1.   Psychiatric Assessments and Diagnoses . . - 21 -

      2.   Psychological Assessments . . . . . . . . - 25 -

      3.   Nursing Assessments . . . . . . . . . . . - 29 -

      4.   Rehabilitation Therapy Assessments . . . . - 31 -

      5.   Nutrition Assessments . . . . . . . . . . - 32 -

      6.   Social History Assessments . . . . . . . . - 34 -

      7.   Court Assessments . . . . . . . . . . . . - 35 -

E.   Discharge Planning and Community Integration . . . . - 39 -

F.   Specific Therapeutic and Rehabilitation Services . . - 41 -

      1.   Psychiatric Services . . . . . . . . . . . - 41 -

      2.   Psychological Services . . . . . . . . . . - 46 -

SCANNED

3.   Nursing Services . . . . . . . . . . . . .   - 50 -

4.   Rehabilitation Therapy Services  . . . . .   - 53 -

5.   Nutrition Services . . . . . . . . . . . .   - 54 -

6.   Pharmacy Services  . . . . . . . . . . . .   - 56 -

7.   General Medical Services . . . . . . . . .   - 56 -

8.   Infection Control  . . . . . . . . . . . .   - 58 -

9.   Dental Services  . . . . . . . . . . . . .   - 59 -

10.  Special Education  . . . . . . . . . . . .   - 60 -

G.   Documentation  . . . . . . . . . . . . . . . . .   - 62 -

H.   Restraints, Seclusion, and PRN and Stat Medications   - 62 -

I.   Protection From Harm . . . . . . . . . . . . . .   - 66 -

1.   Incident Management  . . . . . . . . . .   - 66 -

2.   Performance Improvement  . . . . . . . .   - 73 -

3.   Environmental Conditions . . . . . . . .   - 75 -

J.   First Amendment and Due Process  . . . . . . . .   - 76 -

----------------------------------------------------------------

SCANNED

A.   Definitions

    1.   Effective Date

       The Effective Date will be considered the first day of the month following the date of execution of the agreement by all parties.  Unless otherwise specified, implementation of each provision of this Plan shall begin no later than 12 months after the Effective Date.

    2.   Consistent With Generally Accepted Professional Standards of Care

       A decision by a qualified professional that is substantially aligned with contemporary, accepted professional judgment, practice, or standards as to demonstrate that the person responsible based the decision on such accepted professional judgment.

B.   Introduction

    Each State Hospital shall use a Recovery philosophy of care and a Psychiatric Rehabilitation model of service delivery. Therapeutic and rehabilitative services provided by each State Hospital shall be based on evidence-based practices and practice-based evidence, shall be age-appropriate, and shall be designed to:  strengthen and support individuals' recovery, rehabilitation, and habilitation; enable individuals to grow and develop in ways benefitting their mental health, physical health, and well being; and ensure individuals' reasonable safety, security, and freedom from undue bodily restraint.  Relationships between each State Hospital's staff and the individuals whom they serve shall be positive, therapeutic, and respectful.

1  Each individual served by each State Hospital shall be
2  encouraged to participate in identifying his or her needs and
3  goals, and in selecting appropriate treatment options.
4  Therapeutic and rehabilitation services shall be designed to
5  address each individual's needs and to assist individuals in
6  meeting their specific recovery and wellness goals, consistent
7  with generally accepted professional standards of care.  Each
8  State Hospital shall ensure clinical and administrative
9  oversight, education, and support of its staff in planning and
10  providing care and treatment consistent with these standards.
11  C.   Integrated Therapeutic and Rehabilitation Services Planning
12  Each State Hospital shall provide coordinated,
13  comprehensive, individualized protections, services, supports,
14  and treatments (collectively "therapeutic and rehabilitation
15  services") for the individuals it serves, consistent with
16  generally accepted professional standards of care.  In addition
17  to implementing the therapeutic and rehabilitation planning
18  provisions set forth below, each State Hospital shall establish
19  and implement standards, policies, and practices to ensure that
20  therapeutic and rehabilitation service determinations are
21  consistently made by an interdisciplinary team through integrated
22  therapeutic and rehabilitation service planning and embodied in a
23  single, integrated therapeutic and rehabilitation service plan.
24  1.   Interdisciplinary Teams
25  The interdisciplinary team's membership shall be
26  dictated by the particular needs and strengths of the
27  individual in the team's care.  At a minimum, each State
28

7



SCANNED

1    Hospital shall ensure that the team shall:

2       a.   Have as its primary objective the provision of

3            individualized, integrated therapeutic and

4            rehabilitation services that optimize the

5            individual's recovery and ability to sustain

6            himself/herself in the most integrated,

7            appropriate setting based on the individual's

8            strengths and functional and legal status and

9            support the individual's ability to exercise

10           his/her liberty interests, including the interests

11           of self determination and independence;

12      b.   Be led by a clinical professional who is involved

13           in the care of the individual;

14      c.   Function in an interdisciplinary fashion;

15      d.   Assume primary responsibility for the individual's

16           therapeutic and rehabilitation services, and

17           ensure the provision of competent, necessary, and

18           appropriate psychiatric and medical care;

19      e.   Ensure that each member of the team participates

20           appropriately, by competently and knowledgeably

21           assessing the individual on an ongoing basis and

22           by developing, monitoring, and, as necessary,

23           revising the therapeutic and rehabilitation

24           services;

25      f.   Ensure that assessment results and, as clinically

26           relevant, consultation results, are communicated

27           to the team members, along with the implications

28

1    of those results for diagnosis, therapy and

2    rehabilitation by no later than the next review;

3    g.  Be responsible for the scheduling and coordination

4        of assessments and team meetings, the drafting of

5        integrated treatment plans, and the scheduling and

6        coordination of necessary progress reviews;

7    h.  Consist of a stable core of members, including at

8        least the individual served; the treating

9        psychiatrist; the treating psychologist; the

10       treating rehabilitation therapist; the treating

11       social worker; the registered nurse and

12       psychiatric technician who know the individual

13       best; one of the individual's teachers (for

14       school-age individuals); and, as appropriate, the

15       individual's family, guardian, advocates,

16       attorneys, and the pharmacist and other staff;

17   i.  Not include any core treatment team members with a

18       case load exceeding 1:15 in admission teams (new

19       admissions of 90 days or less) and, on average,

20       1:25 in all other teams at any point in time; and

21   j.  Not include staff that is not verifiably competent

22       in the development and implementation of

23       interdisciplinary treatment plans.

24  2.  Integrated Therapeutic and Rehabilitation Service

25      Planning.

26      Each State Hospital shall develop and implement

27  policies and protocols regarding the development of

28  therapeutic and rehabilitation service plans, referred to as

"Wellness and Recovery Plans" ("WRP") consistent with generally accepted professional standards of care, to ensure that:

    a.   Individuals have substantive input into the therapeutic and rehabilitation service planning process, including but not limited to input as to mall groups and therapies appropriate to their WRP.

    b.   Therapeutic and rehabilitation service planning provides timely attention to the needs of each individual, in particular:

        i.   initial therapeutic and rehabilitation service plans (Admission Wellness and Recovery Plan ("A-WRP")) are completed within 24 hours of admission;

        ii.  master therapeutic and rehabilitation service plans (WRP) are completed within 7 days of admission; and

        iii. therapeutic and rehabilitation service plan reviews are performed every 14 days during the first 60 days of hospitalization and every 30 days thereafter.  The third monthly review is a quarterly review and the 12th monthly review is the annual review.

    c.   Treatment, rehabilitation, and enrichment services are goal-directed, individualized, and informed by a thorough knowledge of the individual's

1    psychiatric, medical, and psychosocial history and

2    previous response to such services.

3    d.   Therapeutic and rehabilitation service planning is

4         based on a comprehensive case formulation for each

5         individual that emanates from interdisciplinary

6         assessments of the individual consistent with

7         generally accepted professional standards of care.

8         Specifically, the case formulation shall:

9         i.    be derived from analyses of the information

10              gathered from interdisciplinary assessments,

11              including diagnosis and differential

12              diagnosis;

13        ii.   include a review of:  pertinent history;

14              predisposing, precipitating and perpetuating

15              factors; previous treatment history; and

16              present status;

17        iii.  consider biomedical, psychosocial, and

18              psychoeducational factors, as clinically

19              appropriate, for each category in § C.2.d.ii

20              above;

21        iv.   consider such factors as age, gender,

22              culture, treatment adherence, and medication

23              issues that may affect the outcomes of

24              treatment and rehabilitation interventions;

25        v.    support the diagnosis by diagnostic

26              formulation, differential diagnosis, and

27              Diagnostic and Statistical Manual-IV-TR (or

28              the most current edition) checklists; and

vi.   enable the interdisciplinary team to reach
sound determinations about each individual's
treatment, rehabilitation, enrichment and
wellness needs, the type of setting to which
the individual should be discharged, and the
changes that will be necessary to achieve
discharge.

e.   The therapeutic and rehabilitation service plan
specifies the individual's focus of
hospitalization (goals), assessed needs
(objectives), and how the staff will assist the
individual to achieve his or her goals/objectives
(interventions).

f.   Therapeutic and rehabilitation service planning is
driven by individualized needs, is strengths-based
(i.e., builds on an individual's current
strengths), addresses the individual's motivation
for engaging in wellness activities, and leads to
improvement in the individual's mental health,
physical health, and well being, consistent with
generally accepted professional standards of care.
Specifically, the interdisciplinary team shall:

i.   develop and prioritize reasonable and
attainable goals/objectives (e.g., at the
level of each individual's functioning) that
build on the individual's strengths and
address the individual's identified needs

12

SCANNED

and, if any identified need is not addressed, provide a rationale for not addressing the need;

ii. ensure that the objectives/interventions address treatment (e.g., for a disease or disorder), rehabilitation (e.g., skills/supports, motivation and readiness), and enrichment (e.g., quality of life activities);

iii. write the objectives in behavioral, observable, and/or measurable terms;

iv. include all objectives from the individual's current stage of change, or readiness for rehabilitation, to the maintenance stage for each focus of hospitalization, as clinically appropriate;

v. ensure that there are interventions that relate to each objective, specifying who will do what, within what time frame, to assist the individual to meet his/her needs as specified in the objective;

vi. implement interventions appropriately throughout the individual's day, with a minimum of 20 hours of active treatment per week.  Individual or group therapy included in the individual's WRP shall be provided as part of the 20 hours of active treatment per week;

13

vii.   maximize, consistent with the individual's
treatment needs and legal status,
opportunities for treatment, programming,
schooling, and other activities in the most
appropriate integrated, non-institutional
settings, as clinically appropriate; and

viii.  ensure that each therapeutic and
rehabilitation service plan integrates and
coordinates all services, supports, and
treatments provided by or through the State
Hospital for the individual in a manner
specifically responsive to the plan's
therapeutic and rehabilitation goals.  This
requirement includes, but is not limited to,
ensuring that individuals are assigned to
mall groups that link directly to the
objectives of the individual's treatment plan
and needs;

g.  Therapeutic and rehabilitation service plans are
revised as appropriate to ensure that planning is
based on the individual's progress, or lack
thereof, as determined by the scheduled monitoring
of identified criteria or target variables,
consistent with generally accepted professional
standards of care.  Specifically, the
interdisciplinary team shall:

i.   revise the focus of hospitalization
objectives, as needed, to reflect the

14

individual's changing needs and develop new
interventions to facilitate attainment of new
objectives when old objectives are achieved
or when the individual fails to make progress
toward achieving these objectives;

ii.   review the focus of hospitalization, needs,
objectives, and interventions more frequently
if there are changes in the individual's
functional status or risk factors (i.e.,
behavioral, medical, and/or psychiatric risk
factors);

iii.  ensure that the review process includes an
assessment of progress related to discharge
to the most integrated setting appropriate to
meet the individual's assessed needs,
consistent with his/her legal status; and

iv.   base progress reviews and revision
recommendations on data collected as
specified in the therapeutic and
rehabilitation service plan.

h.  Individuals in need of positive behavior supports
in school or other settings receive such supports
consistent with generally accepted professional
standards of care.

i.  Adequate active psychosocial rehabilitation is
provided, consistent with generally accepted

15

SCANNED

professional standards of care, that:

i.    is based on the individual's assessed needs and is directed toward increasing the individual's ability to engage in more independent life functions;

ii.    has documented objectives, measurable outcomes, and standardized methodology;

iii.    is aligned with the individual's objectives that are identified in the individual's WRP;

iv.    utilizes the individual's strengths, preferences, and interests;

v.    focuses on the individual's vulnerabilities to mental illness, substance abuse, and readmission due to relapse, where appropriate;

vi.    is provided in a manner consistent with each individual's cognitive strengths and limitations;

vii.    provides progress reports for review by the Interdisciplinary Team as part of the WRP review process;

viii.   is provided 5 days a week, for a minimum of 4 hours a day (i.e., 2 hours in the morning and 2 hours in the afternoon each weekday), for each individual or 2 hours a day when the individual is in school, except days falling on state holidays;

ix.   is provided to individuals in bed-bound

status in a manner and for a period that is

commensurate with their medical status;

x.   routinely takes place as scheduled;

xi.   includes, in the evenings and weekends,

additional activities that enhance the

individual's quality of life; and

xii.   is consistently reinforced by staff on the

therapeutic milieu, including living units.

j.   Adequate individualized and group exercise and

recreational options are provided, consistent with

generally accepted professional standards of care.

k.   Individuals who have an assessed need for family

therapy services receive such services in their

primary language, as feasible, consistent with

generally accepted professional standards of care

and that these services, and their effectiveness

for addressing the indicated problem, are

comprehensively documented in each individual's

chart.

l.   Each individual's therapeutic and rehabilitation

service plan identifies general medical diagnoses,

the treatments to be employed, the related symptoms

to be monitored by nursing staff (i.e., registered

nurses ("RNs"), licensed vocational nurses

("LVNs"), and psychiatric technicians) and the

means and frequency by which such staff shall

17

1    monitor such symptoms, consistent with generally

2    accepted professional standards of care.

3    m.   Children and adolescents receive, consistent with

4    generally accepted professional standards of care:

5         i.    therapy relating to traumatic family and

6               other traumatic experiences, as clinically

7               indicated; and

8         ii.   reasonable, clinically appropriate

9               opportunities to involve their families in

10              treatment and treatment decisions.

11   n.   'Policies and procedures are developed and

12   implemented consistent with generally accepted

13   professional standards of care to ensure

14   appropriate screening for substance abuse, as

15   clinically indicated.

16   o.   Individuals who require treatment for substance

17   abuse are provided appropriate therapeutic and

18   rehabilitation services consistent with generally

19   accepted professional standards of care.

20   p.   Group facilitators and therapists providing

21   therapeutic and rehabilitation services (in groups

22   or individual therapy) are verifiably competent

23   regarding selection and implementation of

24   appropriate approaches and interventions to address

25   therapeutic and rehabilitation service objectives,

26   are verifiably competent in monitoring individuals'

27   responses to therapy and rehabilitation, and

28   receive regular, competent supervision.

q.  Group facilitators and therapists providing
    therapeutic and rehabilitation services in the
    field of substance abuse should be certified
    substance abuse counselors.

r.  Transportation and staffing issues do not preclude
    individuals from attending appointments.

s.  Adequate oversight to treatment, rehabilitation,
    and enrichment groups is provided to ensure that
    individuals are assigned to groups that are
    appropriate to their assessed needs, that groups
    are provided consistently and with appropriate
    frequency, and that issues particularly relevant
    for this population, including the use of
    psychotropic medications and substance abuse, are
    appropriately addressed, consistent with generally
    accepted professional standards of care.

t.  Treatment, rehabilitation, and enrichment services
    are monitored appropriately against rational,
    operationally-defined target variables and revised
    as appropriate in light of significant
    developments, and the individual's progress, or
    lack thereof.

u.  Individuals are educated regarding the purposes of
    their treatment, rehabilitation, and enrichment
    services.  They will be provided a copy of their
    WRP when appropriate based on clinical judgment.

v.  Staff educate individuals about their medications,
    the expected results, and the potential common

19

1          and/or serious side effects of medications, and

2          staff regularly ask individuals about common and/or

3          serious side effects they may experience.

4     w.   Interdisciplinary teams review, assess, and develop

5          positive clinical strategies to overcome

6          individual's barriers to participation in

7          therapeutic and rehabilitation services.

8  D.   Integrated Assessments

9       Each State Hospital shall ensure that, consistent with

10 generally accepted professional standards of care, each

11 individual shall receive, promptly after admission to the State

12 Hospital, an accurate and comprehensive assessment of the

13 conditions responsible for the individual's admission, to the

14 degree possible given the obtainable information at the time of

15 admission.  Thereafter, each individual shall receive an accurate

16 and comprehensive reassessment of the reasons for the

17 individual's continued hospitalization whenever there has been a

18 significant change in the individual's status, or a lack of

19 expected improvement resulting from clinically indicated

20 treatment.  The individual's interdisciplinary team shall be

21 responsible for investigating the past and present medical,

22 nursing, psychiatric, and psychosocial factors bearing on the

23 individual's condition, and, when necessary, for revising

24 assessments and therapeutic and rehabilitation plans in

25 accordance with new information that comes to light.  Each State

26 Hospital shall monitor and promptly address deficiencies in the

27 quality and timeliness of such assessments.

28

1.   Psychiatric Assessments and Diagnoses

Each State Hospital shall provide all of the individuals it serves with routine and emergency psychiatric assessments and reassessments consistent with generally accepted professional standards of care; and:

    a.   Each State Hospital shall use the diagnostic criteria in the most current Diagnostic and Statistical Manual of Mental Disorders ("DSM") for reaching the most accurate psychiatric diagnoses.

    b.   Each State Hospital shall ensure that all psychiatrists responsible for performing or reviewing psychiatric assessments:

        i.   are certified by the American Board of Psychiatry and Neurology ("ABPN") or have successfully completed at least three years of psychiatric residency training in a Accreditation Counsel for Graduate Medical Education accredited program; and

        ii.   are verifiably competent (as defined by privileging at initial appointment and thereafter by reprivileging for continued appointment) in performing psychiatric assessments consistent with the State Hospital's standard diagnostic protocols.

    c.   Each State Hospital shall ensure that:

        i.   within 24 hours of an individual's admission to the State Hospital, the individual

receives an Admission Medical Assessment that
includes: ·

   1)   a review of systems;

   2)   medical history;

   3)   physical examination;

   4)   diagnostic impressions; and

   5)   management of acute medical conditions.

ii.   within 24 hours of an individual's admission
to the State Hospital, the individual
receives an Admission Psychiatric Evaluation
that includes:

   1)   psychiatric history, including a review
of presenting symptoms;

   2)   complete mental status examination;

   3)   admission diagnoses;

   4)   completed AIMS;

   5)   laboratory tests ordered; and

   6)   consultations ordered.

iii.   Within 7 days of an individual's admission to
the State Hospital, the individual receives
an Integrated Psychiatric Assessment that
includes:

   1)   psychiatric history, including a review
of present and past history;

   2)   psychosocial history;

   3)   mental status examination;

   4)   strengths;

   5)   psychiatric risk factors;

SCANNED

6)   diagnostic formulation;

7)   differential diagnosis;

8)   current psychiatric diagnoses;

9)   psychopharmacology treatment plan; and

10)   management of identified risks.

d.   Each State Hospital shall ensure that:

   i.   clinically justifiable diagnoses are provided for each individual, and all diagnoses that cannot be clinically justified for an individual are discontinued no later than the next review;

   ii.   the documented justification of the diagnoses is in accord with the criteria contained in the most current DSM (as per DSM-IV-TR Checklist);

   iii.   differential diagnoses, "deferred," or "rule-out" diagnoses, and diagnoses listed as "NOS" ("Not Otherwise Specified") are timely addressed (i.e., within 60 days), through clinically appropriate assessments, and resolved in a clinically justifiable manner; and

   iv.   "no diagnosis" is clinically justified and documented.

e.   Each State Hospital shall ensure that psychiatric reassessments are conducted at a frequency that reflects the individual's clinical needs.  At a minimum the reassessments are completed weekly for

23

the first 60 days on the admissions units and
monthly on other units.

f.   Each State Hospital shall ensure that psychiatric
reassessments are documented in progress notes that
address the following:

i.      significant developments in the individual's
clinical status and appropriate psychiatric
follow up;

ii.     timely and justifiable updates of diagnosis
and treatment, as clinically appropriate;

iii.    analyses of risks and benefits of chosen
treatment interventions;

iv.     assessment of, and attention to, high-risk
behaviors (e.g., assaults, self-harm, falls)
including appropriate and timely monitoring
of individuals and interventions to reduce
risks;

v.      responses to and side effects of prescribed
medications, with particular attention to
risks associated with the use of
benzodiazepines, anticholinergic medications,
polypharmacy (use of multiple drugs to
address the same condition), and conventional
and atypical antipsychotic medications;

vi.     timely review of the use of "pro re nata" or
"as-needed" ("PRN") and "Stat" (i.e.,
emergency psychoactive) medications and

1    adjustment of regular treatment, as

2    indicated, based on such use; and

3    vii. verification, in a clinically justifiable

4    manner, that psychiatric and behavioral

5    treatments are properly integrated.  The

6    psychiatrist shall review the positive

7    behavior support plan prior to implementation

8    to ensure consistency with psychiatric

9    formulation, document evidence of regular

10   exchange of data or information with

11   psychologists regarding differentiation of

12   learned behaviors and behaviors targeted for

13   psychopharmacological treatments, and

14   document evidence of integration of

15   treatments.

16   g. When individuals are transferred between treatment

17   teams, a psychiatric transfer note shall be

18   completed addressing:  review of medical and

19   psychiatric course of hospitalization, including

20   medication trials; current target symptoms;

21   psychiatric risk assessment; current barriers to

22   discharge; and anticipated benefits of transfer.

23   2. Psychological Assessments

24   a. Each State Hospital shall develop and implement

25   standard psychological assessment protocols,

26   consistent with generally accepted professional

27   standards of care.  These protocols shall address,

28   at a minimum, diagnostic neuropsychological

assessments, cognitive assessments, and I.Q./achievement assessments, to guide psychoeducational (e.g., instruction regarding the illness or disorder, and the purpose or objectives of treatments for the same, including medications), educational, rehabilitation, and habilitation interventions, and behavioral assessments (including functional assessment of behavior in schools and other settings), and personality assessments, to inform positive behavior support plans and psychiatric diagnoses.

b.   Each State Hospital shall require the completion of cognitive and academic assessments within 30 days of admission of all school-age and other individuals, as required by law, unless comparable testing has been performed within one year of admission and is available to the interdisciplinary team.

c.   Each State Hospital shall ensure that all clinicians responsible for performing or reviewing psychological assessments and evaluations are verifiably competent in the methodology required to conduct the assessment.

d.   Each State Hospital shall ensure that all psychological assessments, consistent with generally accepted professional standards of care, shall:

i.     expressly state the clinical question(s) for the assessment;

ii.    include findings specifically addressing the clinical question(s), but not limited to diagnoses and treatment recommendations;

iii.   specify whether the individual would benefit from individual therapy or group therapy in addition to attendance at mall groups;

iv.    be based on current, accurate, and complete data;

v.     determine whether behavioral supports or interventions (e.g., behavior guidelines or mini-behavior plans) are warranted or whether a full positive behavior support plan is required;

vi.    include the implications of the findings for interventions;

vii.   identify any unresolved issues encompassed by the assessment and, where appropriate, specify further observations, records review, interviews, or re-evaluations that should be performed or considered to resolve such issues; and

viii. Use assessment tools and techniques appropriate for the individuals assessed and in accordance with the American Psychological Association Ethical Standards and Guidelines for testing.

e.  Each State Hospital shall ensure that all
    psychological assessments of all individuals
    residing at the State Hospital who were admitted
    there before the Effective Date hereof shall be
    reviewed by qualified clinicians with demonstrated
    current competency in psychological testing and, as
    indicated, revised to meet the criteria in
    § D.2.a & d, above.

f.  Each State Hospital shall ensure that all
    appropriate psychological assessments shall be
    provided in a timely manner whenever clinically
    indicated, consistent with generally accepted
    professional standards of care, including whenever
    there has been a significant change in condition, a
    lack of expected improvement resulting from
    treatment, or an individual's behavior poses a
    significant barrier to treatment, therapeutic
    programming, safety to self or others, or school
    programming, and, in particular:

    i.   before an individual's therapeutic and
         rehabilitation service plan is developed, a
         psychological assessment of the individual
         shall be performed that will:

         1)  address the nature of the individual's
             impairments to inform the psychiatric
             diagnosis; and

         2)  provide an accurate evaluation of the
             individual's psychological functioning

28

to inform the therapeutic and
rehabilitation service planning process;

ii.   if behavioral interventions are indicated, a
structural and functional assessment shall be
performed, consistent with generally accepted
professional standards of care, by a
professional having demonstrated competency
in positive behavior supports; and

iii.  additional psychological assessments shall be
performed, as appropriate, where clinical
information is otherwise insufficient, and to
address unresolved clinical or diagnostic
questions, including differential diagnosis,
"rule-out," "deferred," "no-diagnosis" and
"NOS" diagnoses.

g.  For individuals whose primary language is not
English, each State Hospital shall endeavor to
assess them in their own language; if this is not
possible, each State Hospital will develop and
implement a plan to meet the individual's
assessment needs, including, but not limited to the
use of interpreters in the individual's primary
language and dialect, if feasible.

3.   Nursing Assessments

a.  Each State Hospital shall develop standard nursing
assessment protocols, consistent with generally
accepted professional standards of care.  These
protocols shall address, at a minimum:

29

i.    a description of presenting conditions;

ii.   current prescribed medications;

iii.  vital signs;

iv.   allergies;

v.    pain;

vi.   use of assistive devices;

vii.  activities of daily living;

viii. immediate alerts (e.g., escape risk, physical assault, choking risk, suicidal risk, homicide risk, fall risk, sexual assault, self-injurious behavior, arson, or fire setting); and

ix.   conditions needing immediate nursing interventions.

b.  Nursing may use a systems model (e.g., Johnson Behavioral System Model) for the nursing evaluation.

c.  Each State Hospital shall ensure that all nurses responsible for performing or reviewing nursing assessments are verifiably competent in performing the assessments for which they are responsible. All nurses who are employed at Metropolitan State Hospital shall have graduated from an approved nursing program, shall have passed the NCLEX-RN and shall have a license to practice in the state of California.

30

d.  Each State Hospital shall ensure that nursing
assessments are undertaken on a timely basis, and
in particular, that:

    i.    initial nursing assessments are completed
within 24 hours of the individual's
admission;

    ii.   Further nursing assessments are completed and
integrated into the individual's therapeutic
and rehabilitation service plan within 7 days
of admission; and

    iii.  nursing assessments are reviewed every 14
days during the first 60 days of admission
and every 30 days thereafter and updated as
appropriate.  The 3rd monthly review shall be
a quarterly review and the 12th monthly
review shall be the annual review.

4.  Rehabilitation Therapy Assessments

a.  Each State Hospital shall develop standard
rehabilitation therapy assessment protocols,
consistent with generally accepted professional
standards of care, for satisfying the necessary
components of a comprehensive rehabilitation
therapy assessment.

b.  Each State Hospital shall ensure that each
individual served shall have a rehabilitation
assessment that, consistent with generally accepted
professional standards of care:

SCANNED

1        i.    is accurate and comprehensive as to the
2              individual's functional abilities;

3        ii.   identifies the individual's current
4              functional status and the skills and supports
5              needed to facilitate transfer to the next
6              level of care; and

7        iii.  identifies the individual's life goals,
8              strengths, and motivation for engaging in
9              wellness activities.

10     c.  Each State Hospital shall ensure that all
11        clinicians responsible for performing or reviewing
12        rehabilitation therapy assessments are verifiably
13        competent in performing the assessments for which
14        they are responsible.

15     d.  Each State Hospital shall ensure that all
16        rehabilitation therapy assessments of all
17        individuals who were admitted to the State Hospital
18        before the Effective Date hereof shall be reviewed
19        by qualified clinicians and, as indicated, revised
20        to meet the criteria in § D.4.b, above.

21  5.  Nutrition Assessments
22     Each State Hospital shall provide nutrition
23 assessments, reassessments, and interventions consistent
24 with generally accepted professional standards of care.  A
25 comprehensive nutrition assessment will include the
26 following:

27     a.  For new admissions with high risk referral (e.g.,
28        type I diabetes mellitus, enteral/parenteral

1        feeding, dysphagia/recent choking episode), or upon

2        request by physician, a comprehensive Admission

3        Nutrition Assessment will be completed within 24

4        hours of notification to the dietitcian.

5    b.  For new admissions directly into the

6        medical-surgical unit, a comprehensive Admission

7        Nutrition Assessment will be completed within 3

8        days of admission.

9    c.  For new admissions directly into the skilled

10       nursing facility unit, a comprehensive Admission

11       Nutrition Assessment will be completed within 7

12       days of admission.

13   d.  For new admissions with identified nutritional

14       triggers from Nursing Admission Assessment or

15       physician's consult (e.g., for severe food

16       allergies, tube feeding, extensive dental problems

17       or dental surgery, NPO/clear liquid diet for more

18       than three days, uncontrolled diarrhea/vomiting

19       more than 24 hours, and MAOI, as clinically

20       indicated), a comprehensive Admission Nutrition

21       Assessment will be completed within 7 days of

22       admission.

23   e.  For new admissions with therapeutic diet orders for

24       medical reasons, a comprehensive Admission

25       Nutrition Assessment will be completed within 7

26       days of admission.

27   f.  For individuals with therapeutic diet orders for

28       medical reason after admission, a comprehensive

SCANNED

1                 Admission Nutrition Assessment will be completed

2                 within 7 days of the therapeutic diet order but no

3                 later than 30 days of admission.

4        g.  For all other individuals, a comprehensive

5            Admission Nutrition Assessment will be completed

6            within 30 days of admission.

7        h.  Acuity level of an individual at nutritional risk

8            will be determined by Nutritional Status Type

9            ("NST") which defines minimum services provided by

10          a registered dietitian.

11      i.  The frequency of a comprehensive Nutrition

12          Assessment Update will be determined by the NST.

13          Updates should include, but not be limited to:

14          subjective data, weight, body-mass index ("BMI"),

15          waist circumference, appropriate weight range, diet

16          order, changes in pertinent medication, changes in

17          pertinent medical/psychiatric problems, changes in

18          nutritional problem(s), progress toward

19          goals/objectives, effectiveness of interventions,

20          changes in goals/plan, recommendations, and

21          follow-up as needed.

22      j.  Every individual will be assessed annually.  In

23          addition, individuals will be reassessed when there

24          is a significant change in condition.

25    6.  Social History Assessments

26        Each State Hospital shall ensure that each individual

27 has a social history evaluation that, consistent with

28 generally accepted professional standards of care:

a.  Is, to the extent reasonably possible, accurate, current and comprehensive;

b.  Expressly identifies factual inconsistencies among sources, resolves or attempts to resolve inconsistencies, and explains the rationale for the resolution offered;

c.  Is included in the 7-day integrated assessment and fully documented by the 30th day of an individual's admission; and

d.  Reliably informs the individual's interdisciplinary team about the individual's relevant social factors and educational status.

7.  Court Assessments

a.  Each State Hospital shall develop and implement policies and procedures to ensure an interdisciplinary approach to the development of court submissions for individuals adjudicated "not guilty by reason of insanity" ("NGI") pursuant to Penal Code Section 1026, based on accurate information and individualized risk assessments. The forensic reports should include the following, as clinically indicated:

i.  clinical progress and achievement of stabilization of signs and symptoms of mental illness that were the cause, or contributing factor in the commission of the crime (i.e., instant offense);

35

1     ii.   acts of both verbal and physical aggression

2          and property destruction during the past year

3          of hospitalization and, if relevant, past

4          acts of aggression and dangerous criminal

5          behavior;

6     iii.  understanding of potential for danger and

7          precursors of dangerous/criminal behavior,

8          including instant offense;

9     iv.   acceptance of mental illness and

10         understanding of the need for treatment, both

11         psychosocial and biological, and the need to

12         adhere to treatment;

13     v.    development of relapse prevention plan (i.e.,

14         Personal Wellness Recovery Plan or Wellness

15         Recovery Action Plan) for mental illness

16         symptoms, including the individual's

17         recognition of precursors and warning signs

18         and symptoms and precursors for dangerous

19         acts;

20     vi.   willingness to achieve understanding of

21         substance abuse issues and to develop an

22         effective relapse prevention plan (as defined

23         above);

24     vii.  previous community releases, if the

25         individual has had previous CONREP

26         revocations;

27     viii. social support, financial resources, family

28         conflicts, cultural marginalization, and

1            history of sexual and emotional abuse, if
2            applicable; and
3     ix.    relevant medical issues, all self-harm
4            behaviors, risks for self harm and risk of
5            harm to others, to inform the courts and the
6            facility where the individual will be housed
7            after discharge.
8  b.  Each State Hospital shall develop and implement
9      policies and procedures to ensure an
10     interdisciplinary approach to the development of
11     court submissions for individuals admitted to the
12     hospital pursuant to Penal Code Section 1370,
13     "incompetent to stand trial" ("IST"), based on
14     accurate information and individualized risk
15     assessments.  Consistent with the right of an
16     individual accused of a crime to a speedy trial,
17     the focus of the IST hospitalization shall be the
18     stabilization of the symptoms of mental illness so
19     as to enable the individual to understand the legal
20     proceedings and to assist his or her attorney in
21     the preparation of the defense.  The forensic
22     reports should include the following:
23     i.    relevant clinical description of initial
24           presentation, if available, which caused the
25           individual to be deemed incompetent to stand
26           trial by the court;
27     ii.   clinical description of the individual at the
28           time of admission to the hospital;

37

SCANNED

       iii.  course of hospital stay, describing any progress or lack of progress, response to treatment, current relevant mental status, and reasoning to support the recommendation; and

       iv.  all self-harm behaviors and relevant medical issues, to inform the courts and the facility where the individual will be housed after discharge.

  c.  Each State Hospital shall establish a Forensic Review Panel ("FRP") to serve as the internal body that reviews and provides oversight of facility practices and procedures regarding the forensic status of all individuals admitted pursuant to Penal Code 1026 and 1370. The FRP shall review and approve all forensic court submissions by the Wellness and Recovery teams and ensure that individuals receive timely and adequate assessments by the teams to evaluate changes in their psychiatric condition, behavior and/or risk factors that may warrant modifications in their forensic status and/or level of restriction. The membership of the FRP shall include the Director of Forensic Psychiatry, Facility Director or designee, Medical Director or designee, Chief of Psychology or designee, Chief of Social Services or designee, Chief of Nursing Services or designee, and Chief of Rehabilitation Services or designee. The Director

SCANNED

1          of Forensic Psychiatry shall serve as the chair and

2          shall be a board certified forensic psychiatrist.

3          A quorum shall consist of a minimum of four FRP

4          members or their designees.

5  E.   Discharge Planning and Community Integration

6      Taking into account the limitations of court-imposed

7  confinement, the State shall pursue actively the appropriate

8  discharge of individuals under the State's care at each State

9  Hospital and, subject to legal limitations on the State's control

10 of the placement process, provide services in the most

11 integrated, appropriate setting in which they reasonably can be

12 accommodated, as clinically appropriate, that is consistent with

13 each individual's needs.

14     1.   Each State Hospital shall identify at the 7-day

15         therapeutic and rehabilitation service planning

16         conference, and address at all subsequent planning

17         conferences, the particular considerations for each

18         individual bearing on discharge, including:

19       a.  those factors that likely would foster successful

20          discharge, including the individual's strengths,

21          preferences, and personal life goals;

22       b.  the individual's level of psychosocial functioning;

23       c.  any barriers preventing the individual from

24          transitioning to a more integrated environment,

25          especially difficulties raised in previously

26          unsuccessful placements; and

27       d.  the skills and supports necessary to live in the

28          setting in which the individual will be placed.

2.   Each State Hospital shall ensure that, beginning at the time of admission and continuously throughout the individual's stay, the individual is an active participant in the discharge planning process, to the fullest extent possible, given the individual's level of functioning and legal status.

3.   Each State Hospital shall ensure that, consistent with generally accepted professional standards of care, each individual has a professionally developed discharge plan that is integrated within the individual's therapeutic and rehabilitation service plan, that addresses his or her particular discharge considerations, and that includes:

   a.   Measurable interventions regarding these discharge considerations;

   b.   The staff responsible for implementing the interventions; and

   c.   The time frames for completion of the interventions.

4.   Each State Hospital shall provide transition supports and services consistent with generally accepted professional standards of care.  In particular, each State Hospital shall ensure that:

   a.   Individuals who have met discharge criteria are discharged expeditiously, subject to the availability of suitable placements; and

   b.   Individuals receive adequate assistance in transitioning to the new setting.

40

5.   For all children and adolescents it serves, each State Hospital shall:

    a.   Develop and implement policies and protocols that identify individuals with lengths of stay exceeding six months; and

    b.   Establish a regular review forum, which includes senior administration staff, to assess the children and adolescents identified in § E.5.a, above, to review their treatment plans, and to create an individualized action plan for each such child or adolescent that addresses the obstacles to successful discharge to the most integrated, appropriate placement as clinically and legally indicated.

F.   Specific Therapeutic and Rehabilitation Services

    1.   Psychiatric Services

        a.   Each State Hospital shall develop and implement policies and procedures to ensure system-wide monitoring of the safety, efficacy, and appropriateness of all psychotropic medication use, consistent with generally accepted professional standards of care.  In particular, policies and procedures shall require monitoring of the use of psychotropic medications to ensure that they are:

           i.   specifically matched to current, clinically justified diagnoses or clinical symptoms;

SCANNED

ii.   prescribed in therapeutic amounts, as
      dictated by the needs of the individual
      served;

iii.  tailored to each individual's symptoms;

iv.   monitored for effectiveness against clearly
      identified target variables and time frames;

v.    monitored appropriately for side effects;

vi.   modified based on clinical rationales;

vii.  not inhibiting individuals from meaningfully
      participating in treatment, rehabilitation,
      or enrichment and educational services as a
      result of excessive sedation; and

viii. properly documented.

b.  Each State Hospital shall monitor the use of PRN
    and Stat medications to ensure that these
    medications are administered in a manner that is
    clinically justified and are not used as a
    substitute for appropriate long-term treatment of
    the individual's condition.

c.  Each State Hospital shall monitor the psychiatric
    use of benzodiazepines, anticholinergics, and
    polypharmacy to ensure clinical justification and
    attention to associated risks.

d.  Each State Hospital shall ensure the monitoring of
    the metabolic and endocrine risks associated with
    the use of new generation antipsychotic
    medications.

e.  Each State Hospital shall ensure regular
    monitoring, using a validated rating instrument
    (such as AIMS or DISCUS), of tardive dyskinesia
    ("TD"); a baseline assessment shall be performed
    for each individual at admission with subsequent
    monitoring of the individual every 12 months while
    he/she is receiving antipsychotic medication, and
    every 3 months if the test is positive, TD is
    present, or the individual has a history of TD.

f.  Each State Hospital shall ensure timely
    identification, reporting, data analyses, and
    follow up remedial action regarding all adverse
    drug reactions ("ADR").

g.  Each State Hospital shall ensure drug utilization
    evaluation ("DUE") occurs in accord with
    established, up-to-date medication guidelines that
    shall specify indications, contraindications, and
    screening and monitoring requirements for all
    psychotropic medications; the guidelines shall be
    in accord with current professional literature.  A
    verifiably competent psychopharmacology consultant
    shall approve the guidelines and ensure adherence
    to the guidelines.

h.  Each State Hospital shall ensure documentation,
    reporting, data analyses, and follow up remedial
    action regarding actual and potential medication
    variances ("MVR") consistent with generally
    accepted professional standards of care.

i. Each State Hospital shall ensure tracking of individual and group practitioner trends, including data derived from monitoring of the use of PRNs, Stat medications, benzodiazepines, anticholinergics, and polypharmacy, and of ADRs, DUE, and MVR consistent with generally accepted professional standards of care.

j. Each State Hospital shall ensure feedback to the practitioner and educational/corrective actions in response to identified trends consistent with generally accepted professional standards of care.

k. Each State Hospital shall ensure integration of information derived from ADRs, DUE, MVR, and the Pharmacy & Therapeutics, Therapeutics Review, and Mortality and Morbidity Committees consistent with generally accepted professional standards of care.

l. Each State Hospital shall ensure that all physicians and clinicians are verifiably competent, consistent with generally accepted professional standards of care, in appropriate medication management, interdisciplinary team functioning, and the integration of behavioral and pharmacological treatments.

m. Each State Hospital shall review and ensure the appropriateness and safety of the medication treatment, consistent with generally accepted professional standards of care, for:

44

i.   all individuals prescribed continuous anticholinergic treatment for more than two months;

ii.   all elderly individuals and individuals with cognitive disorders who are prescribed continuous anticholinergic treatment regardless of duration of treatment;

iii.   all individuals prescribed benzodiazepines as a scheduled modality for more than two months;

iv.   all individuals prescribed benzodiazepines with diagnoses of substance abuse or cognitive impairments, regardless of duration of treatment;

v.   all individuals with a diagnosis or evidencing symptoms of tardive dyskinesia; and

vi.   all individuals diagnosed with dyslipidemia, and/or obesity, and/or diabetes mellitus who are prescribed new generation antipsychotic medications.

n.   Each State Hospital shall ensure that the medication management of individuals with substance abuse disorders is provided consistent with generally accepted professional standards of care.

o.   Metropolitan State Hospital shall provide a minimum of 16 hours per year of psychopharmacology instruction, through conferences, seminars,

45

SCANNED

1      lectures and/or videotapes.  Such instruction may

2      be provided either on-site or through attendance at

3      conferences elsewhere.

4  2.   Psychological Services

5      Each State Hospital shall provide adequate and

6  appropriate psychological supports and services that are

7  derived from evidence-based practice or practice-based

8  evidence and are consistent with generally accepted

9  professional standards of care, to individuals who require

10 such services; and:

11     a.   Each State Hospital shall ensure that it has

12          positive behavior support teams (with 1 team for

13          each 300 individuals, consisting of 1 clinical

14          psychologist, 1 registered nurse, 2 psychiatric

15          technicians (1 of whom may be a behavior

16          specialist), and 1 data analyst (who may be a

17          behavior specialist) that have a demonstrated

18          competence, consistent with generally accepted

19          professional standards of care, in the following

20          areas:

21          i.    the development and use of positive behavior

22                support plans, including methods of

23                monitoring program interventions and the

24                effectiveness of the interventions, providing

25                staff training regarding program

26                implementation, and, as appropriate, revising

27                or terminating the program; and

28

46

SCANNED

       ii.   the development and implementation of a
facility-wide behavioral incentive system,
referred to as "BY CHOICE," that encompasses
self-determination and choice by the
individuals served.

  b.  Each State Hospital shall ensure that the Chief of
Psychology has the clinical and administrative
responsibility for the Positive Behavior Support
Team and the BY CHOICE incentive program.

  c.  Each State Hospital shall ensure that:

       i.   behavioral assessments include structural and
functional assessments, and, as necessary,
functional analysis;

       ii.   hypotheses on the maladapative behavior are
based on structural and functional
assessments;

      iii.  there is documentation of previous behavioral
interventions and their effects;

      iv.   behavioral interventions, which shall include
positive behavior support plans, are based on
a positive behavior supports model and do not
include the use of aversive or punishment
contingencies;

       v.   behavioral interventions are consistently
implemented across all settings, including
school settings;

      vi.   triggers for instituting individualized
behavioral interventions are specified and

1          utilized, and that these triggers include

2          excessive use of seclusion, restraint, or

3          psychiatric PRN and Stat medication for

4          behavior control;

5     vii.  positive behavior support teams and team

6          psychologists integrate their therapies with

7          other treatment modalities, including drug

8          therapy;

9     viii. all positive behavior support plans are

10         specified in the objectives and interventions

11         sections of the individual's WRP;

12    ix.  all positive behavior support plans are

13         updated as indicated by outcome data and

14         reported at least quarterly in the present

15         status section of the case formulation in the

16         individual's WRP;

17    x.   all staff has received competency-based

18         training on implementing the specific

19         behavioral interventions for which they are

20         responsible, and performance improvement

21         measures are in place for monitoring the

22         implementation of such interventions;

23    xi.  all positive behavior support team members

24         shall have as their primary responsibility

25         the provision of behavioral interventions;

26         and

27    xii. the BY CHOICE point allocation is updated

28         monthly in the individual's WRP.

48

d.  Each State Hospital shall ensure that it has at
    least one developmental and cognitive abilities
    team (consisting of 1 clinical psychologist, 1
    registered nurse, 1 social worker, 1 psychiatric
    technician, and 1 data analyst (who may be a
    behavior specialist)) who have a demonstrated
    competence, consistent with generally accepted
    professional standards of care, in:  assessing
    individuals with cognitive challenges/disorders;
    developing therapeutic interventions (including
    positive behavior supports); advising therapy and
    rehabilitation providers on the implementation of
    interventions at the cognitive level of the
    individuals; and managing discharge processes for
    individuals with developmental disabilities and
    cognitive challenges/disorders.  This team shall
    assume some of the functions of the positive
    behavior support teams if the individuals they
    serve also need positive behavior supports.

e.  Each State Hospital shall develop and implement a
    Behavioral Consultation Committee, chaired by the
    Chief of Psychology, and co-chaired by the Chief of
    Psychiatry, to review the WRP and maladaptive
    behavior(s) of individuals who have not made timely
    progress on positive behavior support plans.  The
    Chief of Psychology is responsible for the
    functions of this committee, together with members

1    of the positive behavior support team (in functions

2    of the committee that relate to individuals under

3    the care of those team members).  The committee

4    membership shall include all clinical discipline

5    heads, including the medical director, as well as

6    the clinical administrator of the facility.

7    f.  Each State Hospital shall ensure that it has

8        sufficient neuropsychological services for the

9        provision of adequate neuropsychological assessment

10       of individuals with persistent mental illness.

11   g.  All clinical psychologists with privileges at any

12       State Hospital shall have the authority to write

13       orders for the implementation of positive behavior

14       support plans, consultation for educational or

15       other testing, and behavior plan updates.

16   3.  Nursing Services

17   Each State Hospital shall provide adequate and

18   appropriate nursing care and services consistent with

19   generally accepted professional standards of care to

20   individuals who require such services.

21   a.  Each State Hospital shall develop and implement

22       policies and protocols regarding the administration

23       of medication, including pro re nata ("PRN") and

24       "Stat" medication (i.e., emergency use of

25       psychoactive medication), consistent with generally

26       accepted professional standards of care, to ensure:

27       i.    safe administration of PRN medications and

28             Stat medications;

50

ii.   documentation of the circumstances requiring PRN and Stat administration of medications; and

iii.   documentation of the individual's response to PRN and Stat medication.

b.   Each State Hospital shall ensure that all failures to properly sign the Medication and Treatment Record ("MTR") or the controlled medication log are treated as medication variances, and that appropriate follow-up occurs to prevent recurrence of such variances.

c.   Each State Hospital shall ensure that all nursing interventions are fully integrated into the therapeutic and rehabilitation service plan and that nursing interventions are written in a manner aligned with the rest of the interventions in the therapeutic and rehabilitation service plan, in particular, in observable, behavioral, and/or measurable terms.  No nursing care plans other than the nursing interventions integrated in the therapeutic and rehabilitation service plan are required.  No nursing diagnoses other than as specified in the therapeutic and rehabilitation service plan, in terms of the current DSM criteria, are required.

d.   All nursing staff working with an individual shall be familiar with the goals, objectives, and interventions for that individual.

e. Each State Hospital shall ensure that nursing staff timely monitor, document and report the status of symptoms, target variables, health, and mental health status of individuals in a manner that enables interdisciplinary teams to assess each individual's status and respond to interventions, and to modify, as appropriate, individuals' therapeutic and rehabilitation service plans. Each State Hospital shall ensure that all nursing shift changes include a review of changes in status of individuals on the unit.

f. Each State Hospital shall develop and implement a system to monitor nursing staff while administering medication to ensure that:

   i.   nursing staff are knowledgeable regarding each individual's prescribed medications;

   ii.  education is provided to individuals during medication administration;

   iii. nursing staff are following the appropriate medication administration protocol; and

   iv.  medication administration is documented in accordance with the appropriate medication administration protocol.

g. Each State Hospital shall ensure that individuals remain in a "bed-bound" status only for clinically justified reasons.

h. Each State Hospital shall ensure that, before they work directly with individuals, all nursing and

52

1    psychiatric technicians have successfully completed

2    competency-based training regarding:

3        i.    mental health diagnoses, related symptoms,

4            psychotropic medications and their side

5            effects, monitoring of symptoms and target

6            variables, and documenting and reporting of

7            the individual's status;

8        ii.   the provision of a therapeutic milieu on the

9            units and proactive, positive interventions

10           to prevent and de-escalate crises; and

11       iii.  positive behavior support principles.

12    i.  Each State Hospital shall ensure that, prior to

13       assuming their duties and on a regular basis

14       thereafter, all staff responsible for the

15       administration of medication have successfully

16       completed competency-based training on the

17       completion of the MTR and the controlled medication

18       log.

19   4.   Rehabilitation Therapy Services

20       Each State Hospital shall provide adequate,

21   appropriate, and timely rehabilitation therapy services to

22   each individual in need of such services, consistent with

23   generally accepted professional standards of care.

24    a.  Each State Hospital shall develop and implement

25       policies and procedures, consistent with generally

26       accepted professional standards of care, related to

27       the provision of rehabilitation therapy services

28       that address, at a minimum:

53

SCANNED

SCANNED

     i.    the provision of direct services by
rehabilitation therapy services staff; and

     ii.   the oversight by rehabilitation therapists of
individualized physical therapy programs
implemented by nursing staff.

b. Each State Hospital shall provide competency-based
training to nursing staff, as appropriate, on the
use and care of adaptive equipment, transferring,
and positioning, as well as the need to promote
individuals' independence.

c. Each State Hospital shall ensure that individuals
are provided with timely and adequate
rehabilitation therapy services.

d. Each State Hospital, consistent with generally
accepted professional standards of care, shall
ensure that each individual who requires adaptive
equipment is provided with equipment that meets
his/her assessed needs and promotes his/her
independence, and shall provide individuals with
training and support to use such equipment.

5.   Nutrition Services

Each State Hospital shall provide the individuals it
serves, particularly those experiencing weight-related
problems, adequate and appropriate dietary services
consistent with generally accepted professional standards of
care.

a.  Each State Hospital shall modify policies and
    procedures to require that the therapeutic and
    rehabilitation service plans of individuals who
    experience weight problems and/or related health
    concerns include adequate strategies and
    methodologies to address the identified problems
    and that such strategies and methodologies are
    implemented in a timely manner, monitored
    appropriately, and revised, as warranted,
    consistent with generally accepted professional
    standards of care.

b.  Each State Hospital shall ensure that one or more
    treatment team members demonstrate competence in
    the dietary and nutritional issues affecting the
    individuals they serve and the development and
    implementation of strategies and methodologies to
    address such issues.

c.  Each State Hospital shall develop and implement
    policies and procedures to address the needs of
    individuals who are at risk for aspiration or
    dysphagia, including but not limited to, the
    development and implementation of assessments and
    interventions for mealtimes and other activities
    involving swallowing.

d.  Each State Hospital shall ensure that staff with
    responsibilities for assessments and interventions
    regarding aspiration and dysphagia have

55

successfully completed competency-based training
commensurate with their responsibilities.

e. Each State Hospital shall develop and implement
policies and procedures requiring treatment of the
underlying causes for tube feeding placement, and
ongoing assessment of the individuals for whom
these treatment options are utilized, to determine
the feasibility of returning them to oral intake
status.

6. Pharmacy Services

Each State Hospital shall provide adequate and
appropriate pharmacy services consistent with generally
accepted professional standards of care. Each State
Hospital shall develop and implement policies and procedures
that require:

a. Upon the prescription of a new medication,
pharmacists to conduct reviews of each individual's
medication regimen and, as appropriate, make
recommendations to the prescribing physician about
possible drug-to-drug interactions, side effects,
and needs for laboratory work and testing; and

b. Physicians to consider pharmacists'
recommendations, and for any recommendations not
followed, document in the individual's medical
record an adequate clinical justification.

7. General Medical Services

a. Each State Hospital shall provide adequate,
appropriate, and timely preventive, routine,

56

specialized, and emergency medical care to all
individuals in need of such services, consistent
with generally accepted professional standards of
care.  Each State Hospital shall ensure that
individuals with medical problems are promptly
identified, assessed, diagnosed, treated, monitored
and, as monitoring indicates is necessary,
reassessed, diagnosed, and treated, consistent with
generally accepted professional standards of care.

b.  Each State Hospital shall develop and implement
protocols and procedures, consistent with generally
accepted professional standards of care, that:

i.   require the timely provision of initial and
ongoing assessments relating to medical care,
including but not limited to, vision care,
dental care, and laboratory and consultation
services;

ii.  require the timely provision of medical care,
including but not limited to, vision care,
dental care, and laboratory and consultation
services; timely and appropriate
communication between nursing staff and
physicians regarding changes in an
individual's physical status; and the
integration of each individual's mental
health and medical care;

iii. define the duties and responsibilities of
primary care (non-psychiatric) physicians;

57

SCANNED

       iv.   ensure a system of after-hours coverage by primary care physicians with formal psychiatric training (i.e., privileging and proctorship) and psychiatric backup support after hours; and

       v.   endeavor to obtain, on a consistent and timely basis, an individual's medical records after the individual is treated in another medical facility.

   c.  Each State Hospital shall ensure that physicians monitor each individual's health status indicators in accordance with generally accepted professional standards of care, and, whenever appropriate, modify their therapeutic and rehabilitation service plans to address any problematic changes in health status indicators.

   d.  Each State Hospital shall monitor, on a continuous basis, outcome indicators to identify trends and patterns in individuals' health status, assess the performance of medical systems, and provide corrective follow-up measures to improve outcomes.

8.   Infection Control

Each State Hospital shall develop and implement infection control policies and procedures to prevent the spread of infections or communicable diseases, consistent with generally accepted professional standards of care.

   a.  Each State Hospital shall establish an effective infection control program that:

i.   actively collects data regarding infections and communicable diseases;

ii.  assesses these data for trends;

iii. initiates inquiries regarding problematic trends;

iv.  identifies necessary corrective action;

v.   monitors to ensure that appropriate remedies are achieved; and

vi.  integrates this information into the State Hospital's quality assurance review.

9.  Dental Services

Each State Hospital shall provide individuals with adequate, appropriate and timely routine and emergency dental care and treatment, consistent with generally accepted professional standards of care.

a.  Each State Hospital shall retain or contract with an adequate number of qualified dentists to provide timely and appropriate dental care and treatment to all individuals it serves;

b.  Each State Hospital shall develop and implement policies and procedures that require:

i.   comprehensive and timely provision of dental services;

ii.  documentation of dental services, including but not limited to, findings, descriptions of any treatment provided, and the plans of care;

iii.   use of preventive and restorative care
       whenever possible; and

iv.    tooth extractions be used as a treatment of
       last resort, which, when performed, shall be
       justified in a manner subject to clinical
       review.

c. Each State Hospital shall ensure that dentists
   demonstrate, in a documented fashion, an accurate
   understanding of individuals' physical health,
   medications, allergies, and current dental status
   and complaints.

d. Each State Hospital shall ensure that
   transportation and staffing issues do not preclude
   individuals from attending dental appointments, and
   individuals' refusals are addressed to facilitate
   compliance.

e. Each State Hospital shall ensure that
   interdisciplinary teams review, assess, and develop
   strategies to overcome individuals' refusals to
   participate in dental appointments.

10. Special Education

Each State Hospital shall provide the school-age and
other residents, as required by law, who qualify for special
education ("students"), individualized educational programs
that are reasonably calculated to enable these students to
receive educational benefits, as defined by applicable law.

a. Each State Hospital shall develop and implement
   uniform systems for assessing students' individual

60



1    educational needs and monitoring their individual

2    progress.

3    b.  Each State Hospital shall ensure that all

4        Individual Education Plans ("IEPs") are developed

5        and implemented consistent with the Individuals

6        with Disabilities Education Act, 20 U.S.C. § 1400

7        et seq. (2002) ("IDEA").

8    c.  Each State Hospital shall ensure that teachers

9        providing instruction to students at the State

10       Hospital have completed competency-based training

11       regarding teaching and academic instruction,

12       behavioral interventions, monitoring of academic

13       and behavioral progress, and incident management

14       and reporting.

15   d.  Each State Hospital shall ensure that students

16       receive instruction and behavioral supports

17       appropriate to their learning abilities and needs,

18       consistent with generally accepted professional

19       standards of care.

20   e.  Each State Hospital shall provide appropriate

21       literacy instruction, consistent with generally

22       accepted professional standards of care, for

23       students who show deficits in one or more common

24       areas of reading (e.g., decoding or comprehending).

25   f.  Each State Hospital shall, on admission and as

26       statutorily required thereafter, assess each

27       student's capacity to participate, with appropriate

28       supports and services, in an integrated, non-

61

1　　　　　　　　institutional, education environment, and provide

2　　　　　　　　access to an integrated education environment for

3　　　　　　　　those students who can participate in one with

4　　　　　　　　appropriate supports and services. Each State

5　　　　　　　　Hospital shall ensure that all students receive

6　　　　　　　　their education in the least restrictive setting

7　　　　　　　　pursuant to the requirements of the IDEA,

8　　　　　　　　consistent with their legal and clinical status.

9　G.　　Documentation

10　　Each State Hospital shall ensure that an individual's

11　records accurately reflect the individual's response to all

12　treatment, rehabilitation and enrichment activities identified in

13　the individual's therapeutic and rehabilitation service plan,

14　including for children and adolescents, their education plan,

15　consistent with generally accepted professional standards of

16　care. Each State Hospital shall develop and implement policies

17　and procedures setting forth clear standards regarding the

18　content and timeliness of progress notes, transfer notes, school

19　progress notes, and discharge notes, including, but not limited

20　to, an expectation that such records include meaningful,

21　accurate, and coherent assessments of the individual's progress

22　relating to treatment plans and treatment goals, and that

23　clinically relevant information remains readily accessible.

24　H.　　Restraints, Seclusion, and PRN and Stat Medications

25　　Each State Hospital shall ensure that restraints, seclusion,

26　psychiatric PRN medications, and Stat medications are used

27　consistent with generally accepted professional standards of

28　care.

1.  Each State Hospital shall revise, as appropriate, and implement policies and procedures regarding the use of seclusion, restraints, psychiatric PRN medications, and Stat medications consistent with generally accepted professional standards of care.  In particular, the policies and procedures shall expressly prohibit the use of prone restraints, prone containment and prone transportation and shall list the types of restraints that are acceptable for use.

2.  Each State Hospital shall ensure that restraints and seclusion:

    a.  Are used in a documented manner and only when individuals pose an imminent danger to self or others and after a hierarchy of less restrictive measures has been considered in a clinically justifiable manner or exhausted;

    b.  Are not used in the absence of, or as an alternative to, active treatment, as punishment, or for the convenience of staff;

    c.  Are not used as part of a behavioral intervention; and

    d.  Are terminated as soon as the individual is no longer an imminent danger to self or others.

3.  Each State Hospital shall comply with 42 C.F.R. § 483.360(f), requiring assessments by a physician or licensed clinical professional of any individual placed in seclusion or restraints within 1 hour.  Each State Hospital shall also ensure that any individual placed

in seclusion or restraints is continuously monitored by a staff person who has successfully completed competency-based training on the administration of seclusion and restraints.

4.  Each State Hospital shall ensure the accuracy of data regarding the use of restraints, seclusion, psychiatric PRN medications, or Stat medications.

5.  Each State Hospital shall revise, as appropriate, and implement policies and procedures to require the review within 3 business days of individuals' therapeutic and rehabilitation service plans for any individuals placed in seclusion or restraints more than 3 times in any 4-week period, and modification of therapeutic and rehabilitation service plans, as appropriate.

6.  Each State Hospital shall develop and implement policies and procedures consistent with generally accepted professional standards of care governing the use of psychiatric PRN medication and Stat medication, requiring that:

    a.  Such medications are used in a manner that is clinically justified and are not used as a substitute for adequate treatment of the underlying cause of the individual's distress; and

    b.  PRN medications, other than for analgesia, are prescribed for specified and individualized behaviors;

    c.  PRN medications are appropriately time-limited;

SCANNED

    d.  Nursing staff assess the individual within 1 hour of the administration of the psychiatric PRN medication and Stat medication and documents the individual's response; and  A psychiatrist conducts a face-to-face assessment of the individual within 24 hours of the administration of a Stat medication.  The assessment shall address the reason for the Stat administration, the individual's response, and, as appropriate, appropriateness of adjustment to current treatment and/or diagnosis.

7.  Each State Hospital shall ensure that all staff whose responsibilities include the implementation or assessment of seclusion, restraints, psychiatric PRN medications, or Stat medications successfully complete competency-based training regarding implementation of all such policies and the use of less restrictive interventions.

8.  Each State Hospital shall:

    a.  Develop and implement a plan to reduce the use of side rails as restraints in a systematic and gradual way to ensure individuals' safety; and

    b.  Ensure that, as to individuals who need side rails, their therapeutic and rehabilitation service plans expressly address the use of side rails, including identification of the medical symptoms that warrant the use of side rails, methods to address the underlying causes of such medical symptoms, and

1          strategies to reduce the use of side rails, if

2          appropriate.

3  I.    Protection From Harm

4     Each State Hospital shall provide the individuals it serves

5  with a safe and humane environment and ensure that these

6  individuals are protected from harm.

7      1.    Incident Management

8          Each State Hospital shall develop and implement across

9      all settings, including school settings, an integrated

10     incident management system that is consistent with generally

11     accepted professional standards of care.

12        a.  Each State Hospital shall review, revise, as

13            appropriate, and implement incident management

14            policies, procedures and practices that are

15            consistent with generally accepted professional

16            standards of care.  Such policies, procedures and

17            practices shall require:

18          i.    that the State Hospital not tolerate abuse or

19                 neglect of individuals and that staff are

20                 required to report abuse or neglect of

21                 individuals;

22          ii.   identification of the categories and

23                 definitions of incidents to be reported and

24                 investigated; immediate reporting by staff to

25                 supervisory personnel and the State

26                 Hospital's executive director (or that

27                 official's designee) of serious incidents,

28

SCANNED

including but not limited to, death, abuse,
neglect, and serious injury, using
standardized reporting across all settings,
including school settings;

iii.   mechanisms to ensure that when serious
incidents such as allegations of abuse,
neglect, and/or serious injury occur, staff
take immediate and appropriate action to
protect the individuals involved, including
removing alleged perpetrators from direct
contact with the involved individuals pending
the outcome of the facility's investigation;

iv.   adequate competency-based training for all
staff on recognizing and reporting potential
signs and symptoms of abuse or neglect,
including the precursors that may lead to
abuse;

v.   notification of all staff when commencing
employment and adequate training thereafter
of their obligation to report abuse or
neglect to the State Hospital and state
officials.  All staff persons who are
mandatory reporters of abuse or neglect shall
sign a statement that shall be kept with
their personnel records evidencing their
recognition of their reporting obligations.
Each State Hospital shall not tolerate any

mandatory reporter's failure to report abuse
or neglect;

vi.    mechanisms to inform individuals and their
conservators how to identify and report
suspected abuse or neglect;

vii.   posting in each living unit and day program
site a brief and easily understood statement
of individuals' rights, including information
about how to pursue such rights and how to
report violations of such rights;

viii.  procedures for referring, as appropriate,
allegations of abuse or neglect to law
enforcement; and

ix.    mechanisms to ensure that any staff person,
individual, family member or visitor who in
good faith reports an allegation of abuse or
neglect is not subject to retaliatory action,
including but not limited to reprimands,
discipline, harassment, threats or censure,
except for appropriate counseling, reprimands
or discipline because of an employee's
failure to report an incident in an
appropriate or timely manner.

b.   Each State Hospital shall review, revise, as
appropriate, and implement policies and procedures
to ensure the timely and thorough performance of
investigations, consistent with generally accepted
professional standards of care.  Such policies and

68

procedures shall:

i.    require investigations of all deaths, as well as allegations of abuse, neglect, serious injury, and theft. The investigations shall be conducted by qualified investigators who have no reporting obligations to the program or elements of the facility associated with the allegation and have expertise in conducting investigations and working with persons with mental disorders;

ii.    ensure that only the State Hospital staff who have successfully completed competency-based training on the conduct of investigations be allowed to conduct investigations of allegations of petty theft and all other unusual incidents;

iii.    for investigations required by paragraph I.1.b.i, above, provide for the safeguarding of evidence; and

iv.    for investigations required by paragraph I.1.b.i, above, require the development and implementation of standardized procedures and protocols for the conduct of investigations that are consistent with generally accepted professional standards. Such procedures and protocols shall require that:

1  1) investigations commence within 24 hours

2  or sooner, if necessary, of the incident

3  being reported;

4  2) investigations be completed within 30

5  business days of the incident being

6  reported, except that investigations

7  where material evidence is unavailable to

8  the investigator, despite best efforts,

9  may be completed within 5 business days

10  of its availability;

11  3) each investigation result in a written

12  report, including a summary of the

13  investigation, findings and, as

14  appropriate, recommendations for

15  corrective action.  The report's contents

16  shall be sufficient to provide a clear

17  basis for its conclusion.  The report

18  shall set forth explicitly and

19  separately:

20  (i)   each allegation of wrongdoing

21  investigated;

22  (ii)  the names of all witnesses;

23  (iii) the names of all alleged victims

24  and perpetrators;

25  (iv)  the names of all persons

26  interviewed during the

27  investigation;

28  (v)   a summary of each interview;

70

SCANNED

(vi)    a list of all documents reviewed during the investigation;

(vii)    sources of evidence considered, including previous investigations and their results, involving the alleged victim(s) and perpetrator(s);

(viii)    the investigator's findings, including findings related to the substantiation of the allegations as well as findings about staff's adherence to programmatic requirements; and

(ix)    the investigator's reasons for his/her conclusions, including a summary indicating how potentially conflicting evidence was reconciled; and

4)    staff supervising investigations review the written report, together with any other relevant documentation, to ensure that the investigation is thorough and complete and that the report is accurate, complete, and coherent. Any deficiencies or areas of further inquiry in the investigation and/or report shall be addressed promptly. As necessary, staff responsible for investigations shall be

provided with additional training and/or
technical assistance to ensure the
completion of investigations and
investigation reports consistent with
generally accepted professional standards
of care.

c.  Each State Hospital shall ensure that whenever
disciplinary or programmatic action is necessary to
correct a situation or prevent reoccurrence, each
State Hospital shall implement such action promptly
and thoroughly, and track and document such actions
and the corresponding outcomes.

d.  Each State Hospital shall have a system to allow
the tracking and trending of investigation results.
Trends shall be tracked by at least the following
categories:

i.    type of incident;

ii.   staff involved and staff present;

iii.  individuals directly and indirectly involved;

iv.   location of incident;

v.    date and time of incident;

vi.   cause(s) of incident; and

vii.  outcome of investigation.

e.  Each State Hospital shall ensure that before
permitting a staff person to work directly with any
individual, the State Hospital shall investigate
the criminal history and other relevant background
factors of that staff person, whether full-time or

72

SCANNED

1    part-time, temporary or permanent, or a person who

2    volunteers on a regular basis.  Facility staff

3    shall directly supervise volunteers for whom an

4    investigation has not been completed when they are

5    working directly with individuals living at the

6    facility.  The facility shall ensure that a staff

7    person or volunteer may not interact with

8    individuals at the State Hospital in instances

9    where the investigation indicates that the staff

10   person or volunteer may pose a risk of harm to such

11   individuals.

12   2.   Performance Improvement

13       Each State Hospital shall develop, revise as

14   appropriate, and implement performance improvement

15   mechanisms that enable it to comply fully with this Plan, to

16   detect timely and adequately problems with the provision of

17   protections, treatment, rehabilitation, services and

18   supports, and to ensure that appropriate corrective steps

19   are implemented.  Each State Hospital shall establish a risk

20   management process to improve the identification of

21   individuals at risk and the provision of timely

22   interventions and other corrective actions commensurate with

23   the level of risk.  The performance improvement mechanisms

24   shall be consistent with generally accepted professional

25   standards of care and shall include:

26       a.   Mechanisms for the proper and timely identification

27            of high-risk situations of an immediate nature as

28            well as long-term systemic problems.   These

mechanisms shall include, but not be limited to:

    i.    data collection tools and centralized databases to capture and provide information on various categories of high-risk situations;

    ii.   establishment of triggers and thresholds that address different levels of risk, as set forth in Appendix A of this Plan; and

    iii.  identification of systemic trends and patterns of high risk situations;

b.  Mechanisms for timely interventions and other corrective actions by teams and disciplines to prevent or minimize risk of harm to individuals. These mechanisms shall include, but not be limited to:

    i.    a hierarchy of interventions by clinical teams that correspond to triggers and thresholds;

    ii.   timely corrective actions by teams and/or disciplines to address systemic trends and patterns;

    iii.  formalized systems for the notification of teams and needed disciplines to support appropriate interventions and other corrective actions;

    iv.  formalized systems for feedback from teams and disciplines to the standards compliance department regarding completed actions; and

74

     v.    monitoring and oversight systems to support timely implementation of interventions and corrective actions and appropriate follow up; and

  c.  Utilize, on an ongoing basis, appropriate performance improvement mechanisms to assess and address the facility's compliance with its identified service goals.

3.   Environmental Conditions

Each State Hospital shall develop and implement a system to review regularly all units and areas of the hospital to which individuals being served have access to identify any potential environmental safety hazards and to develop and implement a plan to remedy any identified issues, consistent with generally accepted professional standards of care.  Such a system shall require that:

  a.  Potential suicide hazards are identified and prioritized for systematic corrective action, and that such action is implemented on a priority basis as promptly as feasible;

  b.  All areas of the hospital that are occupied by individuals being served have adequate temperature control and deviations shall be promptly corrected;

  c.  Each State Hospital reviews, revises, as appropriate, and implements procedures and practices so that individuals who are incontinent are assisted to change in a timely manner;

1    d.   Each State Hospital thoroughly reviews and revises,
2         as appropriate, its policy and practice regarding
3         sexual contact among individuals served at the
4         hospital.  Each State Hospital shall establish
5         clear guidelines regarding staff response to
6         reports of sexual contact and monitor staff
7         response to incidents.  Each State Hospital
8         documents comprehensively therapeutic interventions
9         in the individual's charts in response to instances
10        of sexual contact;

11   e.   Each State Hospital develops and implements clear
12        guidelines stating the circumstances under which it
13        is appropriate to utilize staff who are not trained
14        to provide mental health services in addressing
15        incidents involving individuals.  Each State
16        Hospital ensures that persons who are likely to
17        intervene in incidents are properly trained to work
18        with individuals with mental health concerns; and

19   f.   Metropolitan State Hospital will institute roving
20        patrols of treatment units, except for the skilled
21        nursing facility, by Hospital Police Officers on a
22        schedule and frequency to be determined by the
23        hospital administration.

24  J.   First Amendment and Due Process

25       Each State Hospital unconditionally permits individuals to
26  exercise their constitutional rights of free speech, including
27  the right to petition the government for redress of grievances
28  without state monitoring and provides them due process.

**ENHANCEMENT PLAN - APPENDIX A**

| Trigger | Thresholds |
|---|---|
| Aggressive Act to Self | 1.1 Any aggression to self resulting in major injury* <br> 1.2 2 or more aggressive acts to self in 7 consecutive days <br> 1.3 4 or more aggressive acts to self in 30 consecutive days |
| Aggressive Act to Others | 2.1 Any peer-to-peer aggression resulting in major injury <br> 2.2 Any aggression to staff resulting in major injury <br> 2.3 2 or more aggressive acts to others in 7 consecutive days <br> 2.4 4 or more aggressive acts to others in 30 |
| Alleged Abuse/ Neglect/Exploitation | 3.1 Any alleged abuse/neglect/exploitation if minor** or major injury |

77

SCANNED

| Body Weight | 4.1 | Body Mass Index (BMI) of 18.5 or less (underweight) |
| | 4.2 | Body Mass Index (BMI) between 25 and 29.9      (overweight) |
| | 4.3 | Body Mass Index (BMI) between 30 and 34.9      (Obesity-Grade I) |
| | 4.4 | Body Mass Index (BMI) between 35 and 39.9      (Obesity-Grade II) |
| | 4.5 | Body Mass Index (BMI) 40 or above (Obesity-Grade III) |
| | 4.6 | Weight Change ± 5% in 1 month |
| | 4.7 | Weight Change ± 7.5% in 3 months |
| | 4.8 | Weight Change ± 10% in 6 months |
| | 4.9 | Waist Circumference over 35″ for females or over 40″ for males |
| Combined Pharmacotherapy | 5.1 | More than 2 intra-class psychotropic medications for psychiatric reasons |
| | 5.2 | More than 3 inter-class psychotropic medications for psychiatric reasons |

SCANNED

| | | |
|---|---|---|
| Escape/AWOL | 6.1 | Any escape attempt/unauthorized absence within facility |
| | 6.2 | Any escape attempt/unauthorized absence outside of facility |
| Falls | 7.1 | Any fall resulting in major injury |
| | 7.2 | Three or more falls in 30 consecutive days |
| Illicit Substances | 8.1 | Any incident of an individual testing positive for illicit substance (street drug) use |
| Medication Variance (Error) | 9.1 | Any medication error that results in major injury or exacerbation of a disease or disorder (i.e., prescribing, transcribing, ordering/procurement, dispensing/storage, administration, and documentation) |

SCANNED

| Mortality | 10.1 Expected deaths |
| | 10.2 Unexpected deaths |
| Non-Adherence to Wellness and Recovery Plan (WRP) | 11.1 Non-adherence to WRP for more than 20% of the interventions in 7 consecutive days (Note: For children and adolescents: include non-attendance at school for more than 20% of the time in 7 consecutive days) |
| One-to-One Observations | 12.1 1:1 for psychiatric/behavioral reasons over 24 hours in 7 consecutive days |
| | 12.2 Any 2:1 for psychiatric/behavioral reasons |
| PRN Medications | 13.1 2 PRNs in 24 hours (for psychiatric/behavioral reasons) |
| | 13.2 3 PRNs in 7 consecutive days |
| | 13.3 15 PRNs in 30 consecutive days |

| | |
|---|---|
| Restraint | 14.1 Restraint for more than 4 hours for adults (Note: more than 4 hours for adolescents and 2 hours for children) |
| | 14.2 More than 3 episodes of restraint in 7 consecutive days |
| | 14.3 More than 5 episodes of restraint in 30 consecutive days |
| Seclusion | 15.1 Seclusion for more than 4 hours for adults (Note: more than 4 hours for adolescents and 2 hours for children) |
| | 15.2 More than 3 episodes of seclusion in 7 consecutive days |
| | 15.3 More than 5 episodes of seclusion in 30 consecutive days |
| Stat Medications | 16.1 2 Stat medications in 24 hours |
| | 16.2 3 Stat medications in 7 consecutive days |
| | 16.3 15 Stat med in 30 consecutive days |

| Suicide Attempt | 17.1 Any suicide attempt |
| | 17.2 Any suicide threat or ideations |

\*   A major injury is an injury that requires treatment of more than basic first aid by medical personnel or any injury resulting from alleged or suspected abuse or any injury judged to have potential for serious harm.

\*\* A minor injury is any injury, other than an injury caused by alleged or suspected abuse, that requires no treatment or only minor first aid and for which the potential for serious harm is judged to have been remote.

**PART II**

**ENFORCEMENT**

A.   Selection of Monitor

Mohamed El-Sabaawi, M.D. shall be appointed as the expert to monitor the State's implementation of this Agreement (the "Monitor").  The Monitor shall have full authority to assess, review, and report independently on the Defendants' implementation of and compliance with the provisions of the Agreement.  No Party, nor any employee or agent of any Party, shall have any supervisory authority over the Monitor's activities, reports, findings, or recommendations.  In the event that Dr. El-Sabaawi is unable to serve or continue serving as the Monitor, or in the event that the Parties for any reason agree to discontinue the use of Dr. El-Sabaawi, the Parties shall meet or otherwise confer within thirty (30) days of being notified of the incapacity or the decision to discontinue use of Dr. El-Sabaawi to select a new Monitor.  If the Parties are unable to agree upon a selection, each Party shall submit two names, along with resumes or curricula vitae and cost proposals, to the Court and the Court shall appoint the Monitor from among the names submitted.  The procedure described in this paragraph shall apply to all successor Monitors.  The Parties agree that the Monitor may use consultants to assist the Monitor.  Any such consultants shall be paid for time, services, and expenses pursuant to the Monitor's existing budget.  In collaboration with the Monitor, the Parties shall meet or otherwise confer whenever necessary to agree upon which particular consultant(s) the Monitor shall use to assist the Monitor in his duties as Monitor.  Neither the

1  Monitor, nor any person or entity hired or retained by the

2  Monitor to assist in furthering any provision of this Consent

3  Judgment, shall be liable for any claim, lawsuit, or demand

4  arising out of the Monitoring of this Consent Judgment.  This

5  paragraph does not apply to any proceeding before this Court for

6  enforcement or payment of contracts or subcontracts for

7  monitoring this Consent Judgment.

8  B.   Budget of the Monitor

9       The Parties and the Monitor have agreed upon the annual

10 budget for the Monitor's work.

11 C.   Reimbursement and Payment Provisions

12      1.   The cost of the Monitor, including the cost of any

13           consultant to assist the Monitor, shall be borne by the

14           State in this action.  All reasonable expenses incurred

15           by the Monitor or any consultant, in the course of the

16           performance of the duties of the Monitor, pursuant to

17           the budget of the Monitor, shall be reimbursed by the

18           State.  The United States will bear its own expenses in

19           this matter.

20      2.   The Monitor shall submit monthly invoices to the

21           Defendants, with a copy to the United States, detailing

22           all expenses the Monitor incurred during the prior

23           month.  These invoices shall include daily records of

24           time spent and expenses incurred, and shall include

25           copies of any supporting documentation, including

26           receipts.  The Defendants agrees to pay each month's

27           invoice in full from the Monitor within thirty (30)

28           days of receipt of the monthly invoice from the

84

1    Monitor.  If the Defendants dispute all or part of the
2    invoice, the Defendants shall notify in writing the
3    Monitor and the United States within ten days of
4    receipt of the Monitor's monthly invoice.  The Monitor,
5    the Defendants and the United States will endeavor to
6    resolve any invoice disputes promptly and in good
7    faith.  Where the Monitor and the Parties are unable to
8    resolve any invoice dispute, the Monitor and/or the
9    Parties may petition the Court to resolve the dispute.

10   D.   Responsibilities and Powers of the Monitor

11   1.   The overall duties of the Monitor shall be to observe,
12   review, report findings, and make recommendations,
13   where appropriate, with regard to the implementation of
14   the foregoing Enhancement Plan at the State Hospitals.
15   The Monitor shall regularly review the therapeutic and
16   rehabilitation services provided to individuals to
17   determine the Defendants' implementation of and
18   compliance with this Consent Judgment.  During the
19   Monitor's review, the Monitor shall have full and
20   complete access to all of the State Hospitals'
21   buildings and facilities, staff, patients, patient
22   records, documentation, and information relating to the
23   issues addressed in this Consent Judgment.  The State
24   Hospitals' Executive Directors shall direct all
25   employees to cooperate fully with the Monitor.  The
26   Monitor shall be permitted to initiate and receive ex
27   parte communications with the Parties.  The Monitor
28   shall devote such time as is necessary to fulfill the

85

1        purposes of the duties and responsibilities of the

2        Monitor pursuant to this Consent Judgment.

3   2.   The Monitor shall consult with the Parties and shall

4        submit a written plan with regard to the methodologies

5        to be used by the Monitor to assess the Defendants'

6        compliance with and implementation of the Consent

7        Judgment.  The Monitor's evaluation shall include:

8        regular on-site inspection of the State Hospitals'

9        facilities and programs for patients, interviews with

10       administrators, professional and other staff,

11       contractors, and patients, and detailed review of

12       pertinent documents and patient records.  The Parties

13       envision that the Monitor may provide specific

14       recommendations to the Defendants with regard to steps

15       to be taken to come into compliance with the Consent

16       Judgment.  However, the Defendants retain the

17       discretion to achieve compliance by any legal means

18       available to them, and may choose to utilize methods

19       other than those that may be proposed by the Monitor or

20       the United States.  The Monitor shall not be empowered

21       to direct the Defendants to take, or to refrain from

22       taking, any specific action to achieve compliance with

23       the Consent Judgment.  The Parties do not intend for

24       the Monitor to have the role of a "Special Master."

25       The Agreement is the product of two governmental

26       agencies exercising their expertise.

27   3.   In any instance in which either party disagrees as to

28       compliance, the Court shall give appropriate deference

1     to the Monitor's assessment of compliance.

2   4.   The Parties envision that the United States and the

3        Monitor shall conduct a "baseline" evaluation of the

4        Defendants' compliance with the terms of this Consent

5        Judgment at the State Hospitals within the first 180

6        days after the filing of this Consent Judgment.  This

7        initial baseline evaluation is intended to inform the

8        Parties and the Monitor of the status of compliance

9        with this Enhancement Plan.  The Monitor shall produce

10       a written report to the Parties with regard to the

11       State's compliance with particular provisions of the

12       Consent Judgment as soon as possible, but at least

13       within 60 days of each visit.

14  5.   Following the baseline tour, the Monitor shall conduct

15       subsequent tours of each State Hospital at least

16       semi-annually, upon reasonable notice to the State

17       Hospital, in order to fulfill his or her obligations

18       pursuant to this Consent Judgment.  In connection with

19       the baseline tours, the Parties and the Monitor shall

20       attempt to agree upon a schedule of subsequent tours

21       and reports for the upcoming year, to be repeated

22       annually thereafter.

23  6.   The Monitor shall provide the Parties with a written

24       report as soon as possible, but at least within 60 days

25       of each tour and shall detail with as much specificity

26       as possible how the State is or is not in compliance

27       with particular provisions of the Consent Judgment.

28       Drafts of the Monitor's reports shall be provided to

the Parties for comment at least ten (10) business days prior to issuance of the reports.  Upon the achievement of eighteen (18) months of substantial compliance with any substantive paragraph(s) of this Agreement, no further reporting shall be required on that paragraph.

7. The Defendants shall notify the Monitor immediately upon the death of any current State Hospital patient, including any person who died following transfer due to medical condition from a State Hospital to another medical facility.  The Defendants shall forward to the Monitor copies of any completed incident reports related to deaths, autopsies and/or death summaries of residents, as well as all final reports of investigations that involve State Hospital patients. The Defendants shall also notify the Monitor immediately if they receive a citation or threat to de-certify a State Hospital from the Centers for Medicaid and Medicare Services.

E. The United States' Access to Information and the State Hospitals

1. The United States shall have full access to, and shall, upon request, receive copies of any documents, records, databases, and information relating to the implementation of this Consent Judgment.  The Defendants shall provide any requested documents, records, databases, and information to the United States as soon as possible, but no later than within thirty (30) business days of the request, or

88

1    within a time frame negotiated by the parties if the
2    volume of requested material is too great to reasonably
3    produce within thirty days.  The United States, upon
4    reasonable notice, shall have full access to all of the
5    State Hospitals' buildings and facilities, staff,
6    patients, patients' records, documentation, and
7    information relating to the issues addressed in this
8    Consent Judgment.  The State Hospitals' Executive
9    Directors.shall direct all employees to cooperate fully
10   with the United States.  The United States may receive
11   and respond to unsolicited calls or contacts from State
12   personnel outside the presence of State
13   representatives.

**PART III**

**MODIFICATION OF TERMS**

16   A.   If the Parties reach a subsequent agreement that varies from
17   the Plan, the new agreement shall be reduced to writing, signed,
18   and filed with the Court for approval.

**PART IV**

**COMPLIANCE AND TERMINATION**

21   A.   The purpose of this Consent Judgment is that the Defendants
22   will be able to achieve desired outcomes for and provide the
23   necessary protections, supports, and services to the
24   individuals served by the State Hospitals.  All of the terms of
25   the Plan set forth in Part I hereof shall be implemented at the
26   State Hospitals within 36 months of the Enhancement Plan's
27   effective date, except that § I.3 of the Plan and all provisions
28   of the Plan having to do with suicide prevention measures shall

89

1   be implemented at the State Hospitals upon the effective date of

2   this Consent Judgment.  This Consent Judgment will be terminated

3   and the case dismissed five (5) years after the effective date of

4   the Consent Judgment.  This Consent Judgment may terminate at an

5   earlier date if the Parties agree that the Defendants are in

6   substantial compliance with each provision of the Consent

7   Judgment, and the State has maintained compliance for at least

8   eighteen (18) months ("maintained sustained compliance").  If

9   Defendants and the Monitor contend that the Defendants have

10  maintained sustained compliance and the United States disagrees,

11  Defendants may move this Court for an order terminating this

12  Consent Judgment.  In any instance in which the parties disagree

13  as to compliance, the Court shall give appropriate deference to

14  the Monitor's assessment of compliance.  Noncompliance with mere

15  technicalities, or temporary failure to comply during a period of

16  otherwise sustained compliance shall not constitute failure to

17  maintain substantial compliance.  At the same time, temporary

18  compliance during a period of sustained noncompliance shall not

19  constitute substantial compliance.

20  B.   At all times, the State shall comply with applicable federal

21  and state licensing requirements.

22  C.   If the United States maintains that the Defendants have

23  failed to carry out any requirement of this Consent Judgment, the

24  United States shall notify the Defendants with specificity of any

25  instance(s) in which it maintains that the Defendants have failed

26  to carry out the requirements of this Consent Judgment.

27  D.   With the exception of conditions or practices that pose an

28  immediate and serious threat to the life, health, or safety of

individuals served by the State Hospitals, the Defendants shall
have thirty (30) days from the date of a deficiency notice from
the United States to cure the claim of noncompliance.  During
this period, the Parties shall coordinate and shall discuss areas
of disagreement and attempt to resolve outstanding differences.

E.   Unless specified to the contrary elsewhere herein, in any
compliance or other adversarial hearing prior to final dismissal
of this action, the burden of proof will be on the Party moving
the Court.

F.   All provisions of this Consent Judgment shall have ongoing
effect until the final dismissal of this action.  The Court shall
retain jurisdiction for all purposes until such time as this
action dismissed.  Independent of the foregoing, if the United
States and the Defendants agree that the State Hospitals have
achieved substantial compliance with each section of this Consent
Judgment, the Parties shall file a joint motion to dismiss this
action.

DATED:    This _2 2_ day of _February_ , 2006.

_George B. Schwartz_
UNITED STATES DISTRICT JUDGE

1  APPROVED AS TO FORM AND CONTENT:

2

3

4  _____
   WAN J. KIM
5  Assistant Attorney General

6

7

8  _____
   SHANETTA Y. CUTLAR
9  Chief, Special Litigation Section

10

11 _____
   BENJAMIN O. TAYLOE, JR.
12 LEE R. SELTMAN
   MARY R. BOHAN
13 WILLIAM G. MADDOX
   JACQUELINE CUNCANNAN
14 MATTHEW J. DONNELLY
   Trial Attorneys
15 United States Department of Justice
   Civil Rights Division

16

17

18 _____
   DEBRA W. YANG
19 United States Attorney
   LEON W. WEIDMAN
20 Assistant United States Attorney
   Chief, Civil Division
21 GARY L. PLESSMAN
   Assistant United States Attorney
22 Chief, Civil Fraud Section
   HOWARD DANIELS (CA Bar No. 081764)
23 Assistant United States Attorney
        300 North Los Angeles Street
24      Federal Building, Room 7516
        Los Angeles, CA  90012
25      (213)894-4024

26

27

28

                              92

1

2

KIMBERLY BELSHE
3  Secretary, State of California
Health and Human Services Agency
4  State of California
Health and Human Services Agency
5  1600 Ninth Street, Room 460
Sacramento, CA 95814

6

7

8

FRANK S. FURTEK
9  Chief Counsel, State of California
Health and Human Services Agency
10  1600 9th Street, Room 460
Sacramento, CA 95814

11

12

13

14  STEPHEN W. MAYBERG
Director, California Department
15  Of Mental Health
California Department of Mental Health
16  1600 9th Street
Sacramento, CA 95814

17

18

19

CYNTHIA RODRIGUEZ
20  Chief Counsel, California Department of Mental Health
Office of Legal Services
21  California Department of Mental Health
1600 9th Street, Room 153
22  Sacramento, CA 95814

23

24

25

26

27

28

SCANNED

1       <u>PROOF OF SERVICE BY MAILING</u>

2       I am over the age of 18 and not a party to the within action.  I am employed by

3 the Office of United States Attorney, Central District of California.  My business

4 address is 300 North Los Angeles Street, Suite 7516, Los Angeles, California 90012.

5       On October 31, 2006, I served **AMENDED CONSENT JUDGMENT** on each

6 person or entity named below by enclosing a copy in an envelope addressed as shown

7 below and placing the envelope for collection and mailing on the date and at the place

8 shown below following our ordinary office practices.  I am readily familiar with the

9 practice of this office for collection and processing correspondence for mailing.  On the

10 same day that correspondence is placed for collection and mailing, it is deposited in the

11 ordinary course of business with the United States Postal Service in a sealed envelope

12 with postage fully prepaid.

13       Date of mailing: October 31, 2006.  Place of mailing: Los Angeles, California.

14       **Person(s) and/or Entity(ies) to Whom mailed:**

15             Cynthia Rodriguez
             Office of Legal Services
16             California Department of Mental Health
             1600 9th Street, Room 153
17             Sacramento, CA 95814

18

19       I declare under penalty of perjury under the laws of the United States of America

20 that the foregoing is true and correct.

21       I declare that I am employed in the office of a member of the bar of this court at

22 whose direction the service was made.

23       Executed on: October 31, 2006 at Los Angeles, California.

24

25             Rossana Alvarez

26

27

28